273 F.3d 564 (3rd Cir. 2001)
 JEFFREY D. ALBRIGHT; NORMAN T. BOIRE; GARY M. DIETZ; WILLIAM H. ERDMAN; MICHAEL W. FRITZ; A. RONALD FROMBAUGH; RALPH A. HARRIS; ALLEN W. LANDIS; LOWELL MCGUIRE; WALTER R. MINICH; RAYMOND C. NEVINS; STANLEY L. NYE; VINCENT RAMIREZ, JR.; KEITH E. SGRIGNOLI; RAY G. SNYDER, JR.; LAWRENCE D. WELKER, APPELLANTS
v.
DANIEL A. VIRTUE, BUSINESS AGENT OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS; INTERNATIONAL BROTHERHOOD OF TEAMSTERS; LOCAL 776, INTERNATIONAL BROTHERHOOD OF TEAMSTERS; ABF FREIGHT SYSTEM, INC.
 No. 00-4279
 UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
 Argued July 30, 2001
Filed December 6, 2001
 
 On Appeal from the United States District Court for the Middle District of Pennsylvania D.C. Civil Action No. 00-cv-00878 (Honorable Sylvia H. Rambo)[Copyrighted Material Omitted]
 Robert S. Mirin, Esquire (argued), Mirin & Jacobson, 8150 Derry Street Harrisburg, Pennsylvania 17111-5260, for Appellants.
 Wendy D. Bowie, Esquire (argued), Ira H. Weinstock, Esquire, Ira H. Weinstock, P.C., 800 North 2nd Street, Suite 100 Harrisburg, Pennsylvania 17102 and James A. McCALL, Esquire, International Brotherhood of Teamsters, 25 Louisiana Avenue, N.W. Washington, DC 20001, for Appellees Daniel A. Virtue, Business Agent of the International Brotherhood of Teamsters; International Brotherhood of Teamsters; Local 776, International Brotherhood of Teamsters.
 Joseph E. Santucci, Jr., Esquire (argued), Mary D. Walsh, Esquire, Morgan, Lewis & Bockius 1800 M Street, N.W. Washington, D.C. 20036 and VINCENT Candiello, Esquire, Morgan, Lewis & Bockius, Llp, One Commerce Square 417 Walnut Street Harrisburg, PA 17101, for Appellee ABF Freight System, Inc.
 Before: Becker, Chief Judge, McKEE and Weis, Circuit Judges
 OPINION OF THE COURT
 Becker, Chief Judge.
 
 
 1
 The plaintiffs in this appeal are members of a Teamsters Local Union in Central Pennsylvania who objected to the manner in which seniority lists were merged following the consolidation of two trucking lines. When their internal union grievances were unsuccessful, they brought what is generally known as a hybrid duty of fair representation/ S 301[1] suit in the District Court for the Middle District of Pennsylvania against the local union, its international union parent, and its business agent, alleging breach of the duty of fair representation (DFR), and against their employer, alleging breach of the collective bargaining agreement. This appeal is from the order of the District Court granting summary judgment for all the defendants based on the statute of limitations, and also from the District Court's order denying the union members' motion for reconsideration.
 
 
 2
 The primary question on appeal is when the six-month statute of limitations began to run against the union members, an issue governed by DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151 (1983) and Scott v. Local 863, International Brotherhood of Teamsters, 725 F.2d 226 (3d Cir. 1984). We have not required that union members who wish to file suit against the union or their employers be given explicit notice that their grievances have been rejected; rather, we have held that the statute of limitations begins to run when "the futility of further union appeals became apparent or should have become apparent." Scott, 725 F.2d at 229. We are faced here with the task of determining when it became clear or should have become clear to the plaintiffs that any appeals through the union were futile.
 
 
 3
 We conclude that the boilerplate language contained in the decision of the grievance committee did not provide clear guidance that the union would no longer proceed with the plaintiffs' grievances, given the attendant circumstances. We refer to letters from several plaintiffs to the business manager of the local union requesting appeals on their grievances and the opportunity to participate in the appeals he undertook on their behalf, and the business manager's indication to them that their appeals were pending. We think that this evidence before the District Court on the motion for summary judgment raises a genuine question of the existence of a date certain on which it became clear or should have become clear to the plaintiffs that further appeals were futile, thereby triggering the statute of limitations. We will therefore set aside the summary judgment in favor of the union and remand for further proceedings.
 
 
 4
 We will also set aside the summary judgment for the employer. On this issue we are guided by our conclusion in Vadino v. A. Valey Engineers, 903 F.2d 253 (3d Cir. 1990) that the relevant statute of limitations inquiry in claims against an employer is two-fold: (1) when did it become clear to a plaintiff that the employer breached the collective bargaining agreement; and (2) when did it become clear that further union appeals were futile. This conclusion was based on the realization that in order to make out a claim against an employer for breach of the collective bargaining agreement, a plaintiff must also allege, as a necessary condition precedent, that the union would not process his grievance. Because there exist genuine issues of fact about when it became clear or should have become clear to plaintiffs that further union appeals were futile, we will also set aside the summary judgment against the employer.
 
 
 5
 The motion for reconsideration is important because its disposition determines the scope of the record that informs the statute of limitations decision. Plaintiffs attached a number of documents to the motion for reconsideration that were not before the District Court on the motion for summary judgment, and the parties dispute whether we may consider them. We will therefore take the motion for reconsideration up first in our discussion. The appeal of the order denying the motion for reconsideration is controlled by our decision in Adams v. Trustee for the New Jersey Brewery Employees' Pension Trust Fund, 29 F.3d 863 (3d Cir, 1994), where we held that Federal Rule of Civil Procedure 59(e), which permits motions for reconsideration to be filed within ten days of the entry of judgment, cannot be enlarged by Rule 6(e), which permits a three-day extension to the time limit when such a limit begins to run from the date of service of notice. We reject plaintiffs' argument that our holding in Adams is undermined by Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993). Being satisfied that, excluding weekends and holidays, the union members did not file their motion for reconsideration within ten days, we will affirm the order denying the motion for reconsideration. Accordingly we will not consider the additional documents (which favor the plaintiffs).
 
 I. Facts and Procedural History
 
 6
 Prior to 1995, each of the plaintiffs was an "over-the-road" truck driver for Carolina Freight Carriers Corporation ("Carolina Freight") at its Carlisle, Pennsylvania terminal, and a member of Local Union No. 776 ("Local #776"), an affiliate of the International Brotherhood of Teamsters ("International Union"). On May 23, 1995, Carolina Freight closed its Carlisle facility and laid off the plaintiffs. On September 25, 1995, Arkansas Best Corporation, the parent company of ABF Freight Systems ("ABF "), a defendant in this action, merged with Worldway Corporation, the parent company of Carolina Freight. ABF was the surviving corporation and the operations of ABF and Carolina Freight were combined.
 
 
 7
 Plaintiffs' employment at Carolina Freight, and subsequently at ABF, was governed by a collective bargaining agreement, the National Master Freight Agreement ("NMFA"), and the Central Pennsylvania Over-The-Road and Local Cartage Agreement (collectively, "CBA"). Plaintiffs' seniority was determined by reference to the CBA, and could be "broken only by discharge, voluntary quit, retirement, or more than five (5) year layoff." Plaintiffs had extensive "recall from layoff " rights for a period of five years from the date of layoff; the CBA laid out the determination of seniority in cases of recall, which we identify in the margin.[2] Plaintiffs contend that ABF and the Teamsters failed to contact them to recall them to work in 1998, as required under the CBA, and that they heard only by "word of mouth" that there were open positions at ABF. Between late November 1998 and February 1999, based on the information they received about open positions at ABF, each of the plaintiffs individually exercised his contractual recall rights and was reinstated at the ABF Carlisle facility.
 
 
 8
 Once reinstated, the plaintiffs claimed that they were placed on the bottom of the roster without any seniority number, and that subsequent postings revising the seniority lists were improperly calculated, in violation of the CBA. See supra note 2. To pursue their claims, plaintiffs filed grievances with Local #776, seeking to have their seniority status recalculated. Following the grievance procedure set out in Article 8 of the NMFA, Local #776 processed the plaintiffs' claims by selecting two "pilot" grievances based on the March 1999 seniority posting to be reviewed by the Eastern Region Joint Area Committee ("ERJAC"). On April 27, 1999 the ERJAC concluded that the pilot grievances were untimely. Local #776 received the ERJAC decision on May 10, 1999 and sent a notice to the plaintiffs on May 11, 1999, including a copy of the ERJAC decision.
 
 
 9
 The ERJAC decision, which was rendered on a preprinted form, stated that "a majority decision of the[ERJAC] in the... dispute will be final, conclusive and binding with no appeal, and further, that neither party will attempt through any overt acts, to void the decision rendered." Notwithstanding this language, some of the plaintiffs complained to Daniel Virtue ("Virtue"), the business manager for Local #776 and a defendant in this action. On May 16, 1999, plaintiff Ray Snyder wrote to Virtue stating, "I feel that my grievance contains different facts than the one it was placed and heard under, therefore I am requesting that you as my representative make any or all appeals that are offered me as a union member under the contract of the International Brotherhood of Teamsters." [A289]. This letter was followed by a similar letter requesting the right to participate in an appeal by plaintiff Walter Minich on May 16, 1999.
 
 
 10
 On May 20, 1999, Virtue responded to the plaintiffs' requests for an appeal and informed them that he had forwarded the appeal to the International.[3] [A279, A337]. Although Virtue's May 20, 1999 letter itself is not part of the record before us, for the reasons explained in the margin we may consider its contents.[4] Subsequently, letters were sent to Virtue by plaintiffs Vincent Ramirez on June 7, 1999 [A337], William Erdman on June 9, 1999[A198], and Lawrence Welker on June 25, 1999 [A304] requesting an "opportunity to participate in the process of formulating an argument in support of my appeal." There is no indication in the record that Virtue ever informed the plaintiffs that the appeals were not progressing. Some of the plaintiffs continued to file grievances when each new seniority posting was issued, but the Union refused to process these grievances, citing the ERJAC decision.[5]
 
 
 11
 On May 16, 2000, more than twelve months after the ERJAC rendered its decision, the plaintiffs filed this action against Virtue, the International Union, and Local #776. The defendants moved to dismiss the complaint pursuant to Rule 12(b)(6), attaching affidavits and exhibits in support of their motion. The plaintiffs then filed a brief in opposition to the motion to dismiss, attaching affidavits and exhibits in support of their position as well. The District Court granted the defendants' motion styled under Rule 12(b)(6); however, because the District Court reviewed affidavits and other documents outside of the pleadings in evaluating defendants' motion to dismiss, we review the record pursuant to Rule 56. Pursuant to Rule 12(b)(6), if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."
 
 
 12
 The District Court held that the six-month statute of limitations for filing an action based on a breach of the duty of fair representation and for breach of the collective bargaining agreement began to run on May 10, 1999, the date on which the plaintiffs received notice of the ERJAC decision, which included the language that the decision was "final, conclusive and binding with no appeal." Since the present action was not filed until May 16, 2000, more than twelve months later, the District Court concluded that the plaintiffs' cause of action was time-barred. It filed its order dismissing the complaint on November 13, 2000. On November 30, 2000, seventeen days after the District Court's order dismissing the complaint, plaintiffs moved for reconsideration. This request was denied.
 
 
 13
 This timely appeal followed. The District Court had jurisdiction pursuant to 28 U.S.C. S 1331 and the Labor Management Relations Act, S 301, 29 U.S.C.A. S 185 (1947). We have jurisdiction pursuant to 28 U.S.C. S 1291. We exercise plenary review over a district court's grant of summary judgment. See Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 441 n.3 (3d Cir. 2000). We set forth the familiar standards governing review of summary judgment motions in the margin.[6] We also exercise plenary review over a district court's denial of a motion for reconsideration as untimely. See Adams v. Trustees of the New Jersey Brewery Employees' Pension Trust Fund, 29 F.3d 863, 869-70 (3d Cir. 1994).
 
 II. The Motion For Reconsideration
 
 14
 Plaintiffs' submission that their motion for reconsideration was timely rests on Rule 6(e), which provides:
 
 
 15
 Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party and the notice or paper is served upon the party by mail, 3 days shall be added to the prescribed period.
 
 
 16
 Fed R. Civ. P. 6(e) (Emphasis added). The District Court entered its summary judgment order on November 13, 2000. Pursuant to Rule 59(e), plaintiffs moved for reconsideration on November 30, 2000, seventeen days after the summary judgment order was entered.[7] As explained supra note 7, excluding holidays and weekends per Rule 6(a), the plaintiffs' motion for reconsideration was filed twelve days after the entry of judgment. Only if Rule 6(e) added three days to the ten-day limit would the motion would be timely.
 
 
 17
 We note at the outset that we have previously concluded that Rule 6(e) does not apply to Rule 59(e) motions for reconsideration. In Adams v. Trustee for the New Jersey Brewery Employees' Pension Trust Fund, 29 F.3d 863 (3d Cir, 1994), we wrote:
 
 
 18
 The [plaintiffs] contend[ ] that since they were `served' the judgment of the court by mail, the rule applies to extend the period. The Rule 6(e) extension is inapplicable here. Rule 59(e) gives the right to move for reconsideration `not later than 10 days after entry of judgment.' (Emphasis added). Thus, the period for bringing the 59(e) motion begins with the `entry of judgment.' Rule 6(e) only extends time limits that begin with `service of notice or other paper upon the party.'
 
 
 19
 Id. at 870. It is thus clear that the critical point for measuring the timeliness of a 59(e) motion is not the date of service, but the date that the judgment is entered. Every court to consider the argument that Rule 6(e) extends the Rule 59(e) time limit by three days has rejected such an argument. See, e.g. Halicki v. La. Casino Cruises, Inc., 151 F.3d 465, 467-68 (5th Cir. 1998); Parker v. Bd. of Pub. Utils., 77 F.3d 1289, 1290-91 (10th Cir. 1996); Derrington-Bey v. D.C. Dep't of Corr., 39 F.3d 1224, 1225-26 (D.C. Cir. 1994); Cavaliere v. Allstate Ins. Co., 996 F.2d 1111, 1113-14 (11th Cir. 1993); Flint v. Howard, 464 F.2d 1084, 1087 (1st Cir. 1972); see also 1 James Moore et al., Moore's Federal Practice S 6.053[3], at 6-35 (3d ed. 1998) ("Rule 6(e) does not apply to time periods that begin with the filing in court of a judgment or order. Thus, Rule 6(e) does not apply to the 10-day period that runs from entry of judgment for moving to alter or amend judgment pursuant to Rule 59(e).").
 
 
 20
 We have also previously concluded that "Rule 6(b) provides that the time limit of Rule 59(e) may not be judicially extended.... [T]he ten-day period `is jurisdictional, and cannot be extended in the discretion of the district court.' " Adams, 29 F. 3d at 870 (citing Welch v. Folsom, 925 F.2d 666, 669 (3d Cir. 1991)). There thus appears to be no error in the District Court's conclusion that the motion was not timely filed in this case. Notwithstanding the foregoing, plaintiffs ask us to reevaluate our holding in Adams based on Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163 (1993).
 
 
 21
 In Leatherman, the Supreme Court struck down the heightened pleading standard in S 1983 cases required by the decisional law of the Fifth Circuit because the heightened standard was not required by the Federal Rules of Civil Procedure. Part of the rationale for the holding was that the Civil Rules must be read literally -- Rule 9(b) specifically addressed the issue of more particular pleadings in certain actions, but did not include S 1983 complaints, so that a court could not require heightened pleading in these cases. Id. at 168. Plaintiffs contend that, under the rationale that the Federal Rules of Civil Procedure should be given full effect as expressed in Leatherman, it is necessary to extend the Rule 59(e) time period by three days as required by Rule 6(e) in order to give effect to the rules as written. We disagree.
 
 
 22
 As we explained in Adams, the clear language of Rule 6(e) demonstrates that it is not applicable to Rule 59(e). Rule 6(e) applies to cases where the time limit is measured from the "date of service," whereas Rule 59(e)'s time limit is measured from the "entry of judgment." Thus, applying the rules as written, as plaintiffs argue we are constrained to do by Leatherman, we conclude that our holding in Adams is sound. The explicit language of the rules contradicts an interpretation that the three-day extension should be added to Rule 59(e). Moreover, the policy behind the short time period in Rule 59(e) is to promote finality of judgments. Rule 6(b), which explicitly denies a court the power to extend the time for taking action under certain rules, was amended in 1946 to include Rule 59(e) because "there should be a definite point where it can be said a judgment is final." Fed. R. Civ. P. 6(b) Advisory Committee Notes to 1946 Amendment. Thus, we disagree with plaintiffs' contention that the policy behind Rule 6(e), providing additional time to adequately prepare a response when the party is served by mail, applies to Rule 59(e) motions. We will therefore affirm the order denying the motion for reconsideration.
 
 
 23
 Having concluded that the motion for reconsideration was not timely, we must determine whether we can consider certain correspondence between Virtue and the plaintiffs that was attached to the request for reconsideration, but not to the affidavits with the motion to dismiss (which, as explained supra, we treat as a motion for summary judgment). Included among these documents that were part of the untimely motion is a May 20, 1999 letter from Virtue to Phil Young, Freight Director, which requests that the plaintiffs' grievances be reviewed per Article 8, Section 2 of the NMFA. See supra note 3. This letter was copied to some of the plaintiffs. Also among the documents accompanying the motion was an August 10, 1999 letter from Virtue to plaintiff Snyder stating that a request for review with respect to his seniority grievance had been forwarded to the National Review Committee. Since we affirm the order of the District Court denying the motion for reconsideration as untimely, these documents were not properly before the District Court and are not part of the record on appeal. We thus adjudicate the appeal on the basis of the documents that were originally before the District Court.
 
 III. Statute of Limitations
 
 24
 Plaintiffs submit that the District Court erred in concluding that their hybrid DFR/S 301 suit was barred by the six-month statute of limitations established in DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151 (1983). In cases such as this one, there are no clear guidelines as to when the statute of limitations begins to run, because the Supreme Court has not required plaintiffs to exhaust all internal union remedies before bringing a S 301 claim. Clayton v. Auto. Workers, 451 U.S. 679, 689-693 (1981) (refusing to require a universal exhaustion requirement). Rather, we have held that the limitations period begins to run when " `the plaintiff receives notice that the union will proceed no further with the grievance.' " Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1986) (quoting Bruch v. United Steelworkers of America, 583 F. Supp. 668, 670 (E.D. Pa. 1984)). No explicit notice has been required by this court; the closest we have come is the statement that the period begins to run "when it becomes clear that further union appeals would be futile." Vadino v. A. Valey Engineers, 903 F.2d 253, 260 (3d Cir. 1990) (quoting Scott v. Local 863, Int'l of Teamsters, 725 F.2d 226, 229 (1984)) (Emphasis added).
 
 
 25
 This approach has been characterized as "court-inspired vagueness," and makes these cases difficult. Scott, 725 F.2d at 230. Most notably, courts are faced with the challenge of determining when the futility of appeals was or should have become "clear" to the plaintiffs, thereby triggering the statute of limitations. As noted in Scott, the futility of further union appeals may not be clear to employee plaintiffs because "union officials may well be equivocal or contradictory in their communications to dissatisfied members and may send such communications through persons within the internal union hierarchy whose authority to bind the union is at best hazy." 725 F.2d at 230 (Becker, J. concurring).[8]
 
 
 26
 A. The Evidence Presented on the Motion for Summary Judgment
 
 
 27
 Defendants argue that the statute of limitations began to run when the plaintiffs received the ERJAC decision on May 10, 1999. In support of this position, they point to the language on the preprinted ERJAC form that was sent to the plaintiffs, which reads, in part, that a decision of the ERJAC "will be final, conclusive and binding with no appeal" and that "neither party [would] attempt through any overt acts, to void the decision rendered." Since plaintiffs filed their claim on May 16, 2000, defendants argue that the six-month statute of limitations period had already run and the suit was time-barred. The District Court agreed with this conclusion, reasoning that the language in the ERJAC decision provided the required notice that the union would no longer proceed with the grievance.
 
 
 28
 Were this the only communication between the plaintiffs and the union prior to filing the present lawsuit in May 2000, the outcome would be clear. However, we believe that additional correspondence that was presented to the District Court and is in the appellate record creates an issue of material fact as to the time at which it became clear or should have become clear to the plaintiffs that further union appeals would be futile, thus commencing the statute of limitations period. The parties came to an agreement on the documents that were before the District Court on the motion to dismiss. This agreement states, in part, that "[a]ll documents in or attached to Supporting Affidavits and Documents to Defendants' Motion to Dismiss" and "[a]ll documents contained in or attached to Conformed Brief in Opposition to Defendants' Motion to Dismiss and Signed Supporting Affidavit Verifications of Plaintiffs" were before the District Court. We find this satisfactory. Excluding the documents attached to the motion for reconsideration for the reasons discussed above, these documents comprise the record on appeal.
 
 
 29
 Among these documents are letters from some of the plaintiffs to Virtue. In particular, on May 16, 1999, plaintiff Snyder wrote to Virtue, stating in relevant part, "I feel that my grievance contains different facts than the one it was placed and heard under, therefore I am requesting that you as my representative make any or all appeals that are offered to me as a union member under the contract of the International Brotherhood of Teamsters." [A289]. On that same day, plaintiff Minich wrote a letter to Virtue with exactly the same request. [A252]. Most important in the record, on June 7, 1999, plaintiff Ramirez wrote to Virtue, stating "Pursuant to a letter dated May 20, 1999, you forwarded my appeal to International.... please advise me immediately of my rights to a statement, presentation of evidence, and/or participating in this appeal process that I may have of right so as to enable to [sic] rectify the injustice imposed on me to date." [A337]. This letter indicates that Virtue told plaintiff Ramirez that his appeal had been forwarded for review. See supra note 4.
 
 
 30
 This letter was followed by a letter on June 9, 1999 from plaintiff Erdman to Virtue, which stated, "Please be advised that by this letter I am formally requesting an opportunity to participate in the process of formulating an argument in support of my appeal.... Please inform me rightly as to what my rights are to personally defend myself in this appeal process as I have had bias [sic] representation to date and have been unjustly treated." [A198]. Plaintiff Welker sent two letters to Virtue on June 7 and June 25, 1999, which both stated that he was "requesting an opportunity to participate in the process of formulating an argument in support of my appeal." [A304].
 
 
 31
 From this correspondence, viewing the evidence in the light most favorable to the non-moving party, in this case the plaintiffs, it is apparent that the plaintiffs reasonably believed that Virtue was undertaking an appeal for some of them. Moreover, subsequent letters from five other plaintiffs indicate that their appeals had been forwarded as well, as they requested the right to participate in those appeals. At all events, under the summary judgment standard it cannot be said that it was clear (or clear to the plaintiffs) that further union appeals would be futile when Virtue gave these plaintiffs the impression that their grievances were on appeal. We cannot conclude, therefore, that the ERJAC decision, even with the boilerplate language, was the end of the grievance process for these plaintiffs and a date certain from which we can calculate the statute of limitations.[9]
 
 
 32
 In this regard, we also take note of the affidavits submitted to the District Court in opposition to the motion to dismiss. We are mindful that documents merely referred to in these affidavits, but which were not attached to such affidavits, cannot be considered either by the District Court or by this court. Pursuant to Rule 56(e), "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." (Emphasis added). However, we may consider the affidavits themselves, which do not entirely depend on the documents. In doing so, we note that the affidavits further elucidate what is suggested in the aforementioned correspondence. In plaintiff Snyder's affidavit, he states that, on May 20, 1999, Virtue "replied to our request for any and all appeals sent." [A279]. Furthermore, in almost every affidavit presented in opposition to the motion to dismiss, the affiant states, "My grievance followed the same grievance history and treated the same as Mr. Snyder's (i.e., it was denied as untimely by the company, referred to the Eastern Conference, it was denied by the Conference and then referred to Phil Young, Freight Director, it's on appeal and then referred to the NGB where it is pending at this time)." (Emphasis added). [A 174, 186, 194, 229, 240, 247, 259, 277].
 
 
 33
 Given this record, we cannot conclude that it was clear to the plaintiffs that further union appeals would be futile.[10] The requests made to Virtue evidence a sincere belief by the plaintiffs that appeals of their grievances were underway and, from the record, it appears that Virtue did undertake appeals on behalf of the plaintiffs (and that he had the authority to do so, notwithstanding the preprinted language on the ERJAC decision, see supra note 9). At the very least, he gave the impression that he did. Moreover, there is no evidence before us that suggests that these appeals have been resolved; the record does not indicate that he gave the plaintiffs any information on the progress of their appeals. Thus, it does not appear from the record that there exists a date certain on which we can say the statute of limitations began to run; it is not clear that the plaintiffs had "notice that the union w[ould] proceed no further with the grievances." Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1985). Hence, we cannot conclude that the Union was entitled to summary judgment on statute of limitations grounds, and we will therefore vacate the summary judgment order of the District Court and remand for further proceedings.
 
 B. Summary Judgment Against the Employer
 
 34
 The plaintiffs contend that ABF breached the CBA by failing to recall the plaintiffs from layoff according to seniority. In addition, plaintiffs argue that ABF artificially inflated its seniority roster by hiring new, less expensive drivers in order to avoid its obligation to employ or recall the plaintiffs. Finally, plaintiffs submit that ABF is in breach of the CBA by failing to dovetail the seniority of the recalled plaintiffs in the prescribed manner. ABF asserts that the order granting summary judgment for it is correct since it did not have any knowledge of ongoing negotiations between the plaintiffs and union representatives and, thus, the statute of limitations on the S 301 claim began to run on the date of the ERJAC decision -- May 10, 1999.
 
 
 35
 The governing case is Vadino v. A. Valey Engineers, 903 F.2d 253 (3d Cir. 1990). Vadino involved a claim brought by an employee against his employer but not the union, alleging both breach of the collective bargaining agreement and breach of the duty of fair representation. In the typical hybrid DFR/S 301 case where an employee sues the union for breach of the duty of fair representation and the employer under S 301 for breach of the collective bargaining agreement, the same statute of limitations applies to both defendants. As we noted in Vadino, the case was "atypical" because the plaintiff sued only his employer, but we observed that such suits are permissible under DelCostello. Thus, in Vadino we had to decide whether the statute of limitations could be tolled as to the employer based on the employer's own actions as well as any assurances given by the union when the employee brings a hybrid DFR/S 301 action only against his employer, and not the union as well.
 
 
 36
 We held in Vadino that the "relevant statute of limitations question... is not only when Vadino knew, or should have known, that the employer breached the contract but also when he knew, or should have known, that further appeals to the Union would be futile." Id. at 261. In reaching this conclusion, we noted that to hold otherwise would "put the plaintiff in an untenable position because of the interconnection between the two claims." Id. at 261. More precisely, if Vadino's cause of action against the employer accrued as of the time of the breach of the collective bargaining agreement, but before it was clear whether further union appeals were futile, Vadino's "ability to file a S 301 suit against [his employer] would be ephemeral because such a claim could not be maintained until he could fairly allege that the Union refused to process his grievance. The unfair representation claim is the necessary `condition precedent' to the employee's suit." Id. (emphasis added). Moreover, we observed that tolling the S 301 claim until the unfair representation claim accrued is "consistent with the congressional goal of resolving labor disputes in the first instance through the collectively bargained grievance procedure." Id.
 
 
 37
 We are guided by our observation in Vadino that a plaintiff's ability to file a S 301 suit against his employer would be elusive if a plaintiff had to file the S 301 claim prior to resolving grievances with the union. A breach of the duty of fair representation claim is a "necessary condition precedent" to the S 301 claim; in hybrid suits where the employee sues both the employer and the union, an employee must still allege that the union refused to process his grievance as a condition precedent to the S 301 claim. Thus, it would not make analytic sense to conclude that the statute of limitations begins to run on the S 301 claim when it has not begun to run on the duty of fair representation claim.[11] We conclude that the statute of limitations may be tolled against the employer in a hybrid case when the employee sues both the employer and the union, even when the reason for tolling the statute of limitations is due to the action of the union alone.
 
 
 38
 Although we affirmed the grant of summary judgment for the employer in Vadino, we did so because we found that Vadino had not filed his lawsuit within the six-month period of time. We rejected Vadino's argument that a request for a grievance within six months of filing suit tolled the statute of limitations, noting that "repeated requests to a union to institute a grievance...[could not] perpetually toll the statute of limitations, despite the employee's belief that such requests were futile." Id. at 262-263 (emphasis added). The facts of the case before us are different; here we conclude that there is a genuine issue of material fact as to whether or not the plaintiffs did know or should have known that further appeals were futile. Since that is, as of yet, unknown, we cannot conclude that summary judgment was appropriate for the employer and will therefore set aside the order of the District Court granting summary judgment for ABF.
 
 
 39
 We do not believe this result to be inconsistent with the federal labor policy of promoting a prompt resolution of disputes within the framework of the collective bargaining agreement. We have recognized speedy resolution as a policy of federal labor law, see Grasty v. Amalgamated Clothing & Textile Workers Union, 828 F.2d 123, 132-133 (3d Cir. 1987), but we have also recognized the "congressional goal of resolving labor disputes in the first instance through the collectively bargained grievance procedures," Vadino, 903 F.2d at 262. Affirming summary judgment for ABF, while reversing summary judgment for the Union, would thwart this goal. As we noted in Vadino, "to require a plaintiff to sue in court while the grievance procedure has not run its course would be both inefficient, as the grievance procedure may afford the plaintiff all the relief s/he seeks, and unfair, as the plaintiff will be put in the position of suing the union while it still represents him/her." Id. at 262 n.11.
 
 IV. Conclusion
 
 40
 For the foregoing reasons, we will vacate the order granting summary judgment and remand for further proceedings, but will affirm the order denying the motion for reconsideration. Parties will bear their own costs.
 
 
 
 NOTES:
 
 
 [1]
 S 301 of the Labor Management Relations Act, 29 U.S.C.A. S 185 (1947).
 
 
 [2]
 There are two provisions that govern recall and seniority rights in the NMFA. The first, Article 5, Section 2(c)(2), governs recall from layoff in order of seniority and states that "inactive seniority rosters (employees who are on a letter of layoff) shall be similarly `dovetailed' by appropriate classification. If additional employees are required after the active list is exhausted, they shall be recalled from such inactive seniority roster and after recall such employees shall be `dovetailed' into the active seniority roster with their continuous classification (road or city) seniority dates they are currently exercising which shall then be exercised for all purposes." The second provision, Article 5, Section 5, deals with employees who elected a transfer to a new terminal during layoff and states that "Over-the-road employees, who are on a letter of layoff, shall be given an opportunity to transfer to permanent over-the-road employment (prior to the employment of new hires) occurring at the over-the-road domiciles of the Employer located within the Regional area provided they notify the Employer in writing of their interest in a transfer opportunity.... Any employee accepting such offer shall be paid at the employee's applicable rate of pay and shall be placed at the bottom of the seniority board for bidding and layoff purposes, but shall retain company seniority for fringe benefits only."
 
 
 [3]
 Pursuant to Article 8, Section 2 of the CBA, the National Grievance Committee may review and set aside the interpretation of any area committee, such as the ERJAC. The relevant portion of the CBA reads:
 The National Grievance Committee by majority vote may consider and review all questions of interpretation which may arise under the provisions contained in the National Master Freight Agreement which are submitted by either the National Freight Director or the designated employer representative; and shall have the authority to reverse and set aside the majority interpretation of any area, regional, or local grievance committee or arbitration panel established within the Supplemental Agreements if, in its opinion, such interpretation is contrary to the provisions set forth in the National Master Freight Agreement, in which case the decision of the National Grievance Committee shall be final and binding.
 
 
 [4]
 While this letter was not part of the record before the District Court on the motion for summary judgment, there were extensive references to it. Most importantly, before the District Court on the motion for summary judgment was the affidavit of plaintiff Ramirez. Attached to this affidavit is the June 7, 1999 letter from Ramirez to Virtue, which references Virtue's May 20, 1999 letter by stating, "Pursuant to letter dated May 20, 1999, you forwarded my appeal to International." While a statement concerning what Virtue told the plaintiffs would normally be hearsay, in this context the statement, referenced in a sworn affidavit, is by a party-opponent offered against that party and therefore falls within the exception to the hearsay rule. See Federal Rule of Evidence 801(d)(2)(D) ("A statement is not hearsay if.... The statement is offered against a party and is a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship..."). Thus, although the actual May 20, 1999 letter does not appear in the record before the District Court on the motion for summary judgment and is therefore not part of the record on appeal, we will treat the statement in plaintiff Ramirez's letter as fairly representing what Virtue told the plaintiffs respecting an appeal of the ERJAC decision for purposes of our analysis of the statute of limitations, infra Part IIIA.
 
 
 [5]
 These additional grievances are not directly at issue in this case, as the plaintiffs argument pertains specifically to the handling of the filed grievances from which the "pilot" grievances were selected.
 
 
 [6]
 Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. Pro. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The judge's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).
 
 
 [7]
 In calculating the Rule 59(e) ten-day period relative to the District Court's summary judgment order, the day the order was filed and intermediate Saturdays, Sundays, and legal holidays are not included in the computation. Fed. R. Civ. P. 6(a). Excluding the weekends and Thanksgiving holiday, the motion for reconsideration in this case was not filed until 12 days after the summary judgment order was entered.
 
 
 [8]
 In the view of the writer, this situation creates a guessing game for a plaintiff:
 [I]f, in reliance on what he thought were genuine internal remedies, he refrains from suing for as much as six months, and it is ultimately determined that these remedies were illusory, his suit will be forever barred.... [T]o avoid this trap, employee plaintiffs will have to file numerous precautionary lawsuits... in the hopes that perhaps one of the suits will have been timed correctly.
 Scott, 725 F.2d at 231.
 
 
 [9]
 Although not argued by the plaintiffs, we note that there is arguably another ground for this conclusion. As referenced supra note 3, according to the CBA, the National Grievance Committee has the authority "to reverse and set aside the majority interpretation of any area, regional, or local grievance committee or arbitration panel... if, in its opinion, such interpretation is contrary to the provisions set forth in the National Master Freight Agreement, in which case the decision of the National Grievance Committee shall be final and binding." (Emphasis added). Thus, it appears that there is an inconsistency between the language on the preprinted ERJAC form and the CBA with respect to the finality of the ERJAC decisions. Pursuant to the CBA, ultimate authority rests with the National Grievance Committee. Under this reading, the ERJAC decision was not the time at which further union appeals would be futile, thereby triggering the statute of limitations. However, we need not rely on this argument.
 
 
 [10]
 Situations like the one presented in this case could easily be avoided. As was observed in the Scott concurrence, the guesswork could be eliminated by allowing the statute of limitations to begin running "only from the time that the employee has received from[the union] a clear, written statement telling him that further internal appeals are futile, and the time for judicial action has begun." Scott, 725 F.2d at 231 (Becker, J. concurring). Alternatively, or in addition, a union could have the option of "waiving (in equally express terms) any reliance on its right under Clayton to bar suits for failure of the employee to exhaust internal union remedies." Id. If such a "right-to-sue" letter or waiver were required in cases like the one before us, plaintiffs and courts would no longer have to subject themselves to the guessing game of determining when it became clear or should have become clear that further appeals through the union were futile.
 
 
 [11]
 In addition, we observe that allowing the statute of limitations to run against the employer while an employee is still pursuing a grievance with the union might frustrate an employee's ability to seek redress for breach of contract against the employer since the employee needs to pursue the grievance with the union prior to suing the employer. Although we express no view on plaintiffs' allegations in this case that ABF artificially inflated its seniority board by hiring new driver's so as to avoid its obligation to employ or recall the plaintiffs in this case, this suggests the type of problem that might escape judicial review if we were to toll the limitations separately in hybrid DFR/S 301 actions.